IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Beth Kearley,                                    :
                     Petitioner                  :
                                                 :    No.  1642 C.D. 2018
          v.                                     :
                                                 :    Submitted:  May 17, 2019
Unemployment Compensation                        :
Board of Review,                                 :
                     Respondent                  :


BEFORE:    HONORABLE P. KEVIN BROBSON, Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge


*OPINION NOT REPORTED*

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                              FILED:  July 11, 2019


          Beth Kearley (Claimant) petitions, *pro se*, for review of the order of the
Unemployment Compensation Board of Review (Board), which affirmed a referee's
decision that found Claimant ineligible for unemployment compensation (UC) benefits
under section 402(b) of the Unemployment Compensation Law (Law)[1].  We affirm.


                          **Facts and Procedural History**

          Claimant worked as a full-time service agent for Convergys Customer
Management Group, Inc. (Employer) from January 22, 2018, until May 9, 2018, when
she officially resigned from her position citing workplace stress due to call metrics.

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. §802(b)
(relating to voluntary separation without cause of a necessitous and compelling nature).

(Referee Finding of Fact (F.F.) Nos. 1, 11.) Claimant applied for UC benefits and was found ineligible under section 402(b) of the Law by the local service center. (Certified Record (C.R.) at Item No. 5, p. 1.) Claimant appealed and a referee conducted a hearing on July 11, 2018, at which Claimant and one witness for Employer appeared and testified.

Claimant testified that, having worked at a similar call center previously, she was not interested in working in that kind of a stressful environment again. (C.R. at Item No. 9, Notes of Testimony (N.T.) at 3.) Claimant stated that "from the first phone interview to [sic] the recruiter to the interview right on through while I was still in training, I constantly asked about how important numbers and metrics, et cetera, were." *Id.* Claimant testified that she was always told that Employer was "very laid back" and "not scripted" and that there was "nothing [Claimant] ha[d] to worry about." *Id.* However, Claimant explained that these assurances turned out to be false because, after beginning her work for Employer, she received daily emails detailing both individual and team numbers and metrics. (N.T. at 3-4.) Claimant testified that she had to force herself to attend work and that company morale was low due to the concentration on numbers. (N.T. at 4.) Claimant discussed her issues with her team leader, who had told her to leave the numbers to him. (N.T. at 5.) While Claimant found the position stressful, she was willing to try and "make the decision work." (N.T. at 5.)

Claimant explained that the "final straw" was when Employer shuffled the teams on her floor and she was no longer under the same team leader. (N.T. at 4.) Claimant discovered the change in team configuration from a coworker on one of her days off. *Id.* Claimant stated that the shuffling of the teams was the catalyst for her decision to resign from her employment. (N.T. at 5.) Claimant contacted Employer

2

soon after the teams were reassigned to state that she "just could not do it anymore." (N.T. at 4.)

After informing Employer of her intention to resign, Employer set up a meeting with Claimant, where several work alternatives were given to Claimant in an attempt to rectify the then current situation. Claimant testified that she was offered the opportunity to either return to her old team leader or to work in the payroll queue. Claimant did not accept the former offer, as Employer did not provide her a guarantee as to how long she could remain on her old team. Although the latter offer would have placed Claimant into a different department, she testified that she turned it down because metrics and numbers would still have been a focus of the position. Claimant felt misled as to what her position with Employer was to be, as she was led to believe "that numbers and things like that were not going to be the main focus of the job." *Id.* Despite her stress and the feeling that she had been misled, Claimant testified that her numbers were acceptable to Employer and that she had never been written up for having poor numbers. (N.T. at 5.)

Employer presented the testimony of Ms. Amy O'Hara, Employer's Human Resources Business Partner. Ms. O'Hara testified that Claimant's recollection of events was basically correct. Ms. O'Hara testified that she was surprised to hear that Claimant wished to resign and arranged a meeting with Claimant and others on May 7, 2018, to see if Employer could "give [Claimant] some other options, [and Claimant could] tell [Employer] what was going on." *Id.* Ms. O'Hara testified that during that meeting, Claimant expressed the stress and dissatisfaction she felt with the emphasis placed on metrics and numbers. Claimant stressed to Ms. O'Hara and the others that she felt she had been misled with regard to how important metrics and numbers were to Employer. As a result of Claimant's professed stress, Ms. O'Hara

3

testified that Employer offered Claimant a few solutions. Employer offered to return Claimant back to her original team leader, but Ms. O'Hara admitted that she and Employer were not sure how long that arrangement would remain feasible. Ms. O'Hara also testified that Employer offered Claimant a position in a new line of business, *i.e.*, payroll, which did not receive as many calls and, therefore, would be less stressful. While this option would have required Claimant to remain in her current position for ten days, Employer was prepared to place her with the next training class. Despite these offers, Ms. O'Hara testified that she received a resignation letter from Claimant on May 9, 2018, two days after Employer's meeting with her. While Claimant "did thank [Employer] for the opportunities, [ ] she just didn't think it was the right position for her." (N.T. at 6.)

By decision dated July 12, 2018, the referee found Claimant ineligible for UC benefits. The referee found the following:

1. [Claimant] was employed by [Employer] as a full-time service agent earning $12.75 per hour from January 22, 2018 through April 30, 2018, her last day of work.
2. During [Claimant's] interview process, [Claimant] questioned [sic] on whether call metrics were utilized in reviewing performance.
3. [Claimant] was assured that [Employer] was laid back and concentrated on customer service and not call metrics.
4. Once [Claimant] began working, she saw that [Employer] placed a large emphasis on call metrics and numbers as emailed [sic] would be sent and boards would be updated with individual and team numbers.
5. [Claimant] was not disciplined for her call metrics and was meeting the standards.
6. On May 1, 2018, [Claimant] was off work and notified by a coworker that [Employer] had shuffled all of the teams

4

and assigned individuals to different teams with different leaders.

7. [Claimant] was upset by the team changes and notified [Employer] that she would be resigning.

8. [Employer] conducted a meeting with [Claimant] on May 7, 2018, in an attempt to continue [Claimant's] employment.

9. During that meeting, [Claimant] expressed her dissatisfaction with the emphasis on call metrics and indicated that it was stressful.

10. [Employer] offered to keep [Claimant] on a team with her current leader, and offered her a position in a different line of business which [Employer] felt would be less stressful.

11. [Claimant] resigned May 9, 2018, as she was dissatisfied with [Employer's] changes and felt emphasis on call metrics was stressful.

(F.F. Nos. 1-11.)

Based on these findings, the referee concluded that Claimant did not have a necessitous and compelling reason to quit her position. The referee noted that in cases of voluntary separation, the burden is on the claimant to prove necessitous and compelling circumstances existed for quitting. To establish eligibility for UC benefits, a claimant must establish that she notified her employer of the necessitous and compelling conditions so that the employer has the chance to respond to the conditions. The referee observed that "a claimant's dissatisfaction with an employer's reasonable modification in employment conditions is not considered good cause for termination. Dissatisfaction with reasonable changes in hours, assigned duties, or worksites may not, in and of themselves, be good cause for quitting." (Referee Decision at 2.)

In Claimant's case, the referee stated that while Claimant felt deceived as to the workplace conditions, she continued working for Employer for four months. To the referee, this showed that Claimant had accepted Employer's terms and conditions

of the position. The referee further found that Claimant had not communicated to Employer that its emphasis on call metrics was affecting her ability to perform her position prior to resigning. *Id*. The referee found that Claimant ultimately voluntarily resigned as a result of her dissatisfaction with Employer's new team assignments. *Id.* at 2-3. The referee stated that changing the configuration of the teams was a reasonable modification on the part of Employer and, therefore, was not good cause for Claimant to voluntarily terminate employment. The referee further noted that Employer had offered to modify Claimant's work to alleviate some of her stress, but Claimant had not accepted Employer's offer. Therefore, the referee found Claimant ineligible for UC benefits. *Id.* at 3.

Claimant appealed to the Board, arguing that she had not presented all of the facts in her hearing before the referee. Claimant asserted that she had informed Employer that its call metrics were causing her stress and discussed it with her team leader on a few occasions. Claimant further stated that the new position Employer offered her in order to reduce her stress would not actually have accomplished that goal, as there still would have been an emphasis on metrics in the new position. Finally, Claimant alleged that while the referee found that Claimant had worked under Employer's conditions for four months, she had actually been on the phones and subject to Employer's call metrics for only two months, due to training and difficulty procuring equipment that would be compatible with her hearing aids. (C.R. at Item No. 11.)

However, the Board affirmed the decision of the referee, adopting and incorporating the referee's findings. (Board Decision at 1.) In addition, the Board found that "[Claimant's] fears about stress [in the new position] were speculative, as she did not make a good faith effort to preserve the employment relationship and

6

perform the different position prior to quitting." *Id.* The Board also noted that Claimant had not established a sufficient health reason for leaving her job. *Id.*

## Discussion

Claimant now petitions this Court for review of the Board's order,[2] arguing that her reasons for terminating her employment were necessitous and compelling, and therefore she is not ineligible for UC benefits under section 402(b) of the Law. Claimant argues on appeal that her stress from working at a position that was so heavily focused on numbers and metrics gave her a necessitous and compelling reason to terminate her employment. Claimant alleges that she informed Employer of the stress her position placed upon her and, therefore, she did not accept the terms and conditions of her employment. Claimant also argues that, while Employer offered her a position with its payroll queue that it claimed was less stressful, the offer was not made in good faith, as she believed the position would still be based on the same numbers and metrics that led her to quit her position. Claimant argues that "easier and less stressful are not synonymous in this case." (Claimant's Br. at 13.) Therefore, Claimant argues that the Board's determination in her case should be reversed.

Section 402(b) of the Law provides that an employee shall be ineligible for UC benefits for any week in which he or she voluntarily left his or her employment without a necessitous and compelling reason. 43 P.S. §802(b). Whether a claimant has a necessitous and compelling reason to quit is a conclusion of law that is reviewable by this Court. *Taylor v. Unemployment Compensation Board of Review*, 378 A.2d 829,

---

[2] Our review of the Board's order "is limited to determining whether the necessary findings of fact were supported by substantial evidence, whether errors of law were committed, or whether constitutional rights were violated." *Johns v. Unemployment Compensation Board of Review*, 87 A.3d 1006, 1009 n.2 (Pa. Cmwlth. 2014).

7

832 (Pa. 1977). The burden to show a necessitous and compelling reason existed to terminate employment rests with the claimant. *Petrill v. Unemployment Compensation Board of Review*, 883 A.2d 714, 716 (Pa. Cmwlth. 2005).

An employee who claims to have left employment for a necessitous and compelling reason must prove that (1) circumstances existed which produced real and substantial pressure to terminate employment; (2) such circumstances would compel a reasonable person to act in the same manner; (3) the claimant acted with ordinary common sense; and, (4) the claimant made a reasonable effort to preserve her employment. *Brunswick Hotel & Conference Center, LLC v. Unemployment Compensation Board of Review*, 906 A.2d 657, 660 (Pa. Cmwlth. 2006). "It is well-settled that an employer's imposition of a substantial unilateral change in the terms of employment constitutes a necessitous and compelling cause for an employee to terminate her employment." *Id.* However, mere dissatisfaction with working conditions is not considered a necessitous and compelling reason to terminate employment. *McKeown v. Unemployment Compensation Board of Review*, 442 A.2d 1257, 1258 (Pa. Cmwlth. 1982).

Here, Claimant argues that she did have a necessitous and compelling reason to terminate employment. Claimant, bearing the burden of proof, must satisfy the requirements laid out in *Brunswick Hotel* to prove that she had a necessitous and compelling reason for quitting. Regarding the first two prongs of this test, this Court concludes that circumstances existed that would place real and substantial pressure on a reasonable person to terminate her employment. Claimant entered into a relationship with Employer believing that the job she had been hired to do, a call center position, did not focus on metrics and numbers. Claimant made it a point to ask multiple times throughout the interviewing process and her training whether metrics would be a part

8

of her position. Claimant was told each time that Employer was "very laid back" and that there was nothing to worry about. (N.T. at 3.) From these assertions, Claimant could reasonably believe that metrics were not a focus of Employer. However, the actions of Employer in disseminating the metrics and numbers of its teams paints a different picture. Employer's habit of emailing and posting its color-coded numbers multiple times a day, indicates it was not "laid back" and did place emphasis on its metrics. (N.T. at 5.)

Conversely, the Board contends in its brief that it was the shuffling of the teams that caused Claimant to quit, not the overall stress from the metrics. As a result, the Board argues, Claimant's request for UC benefits must be denied as the shuffling of employees only amounts to an employer's decision on how to distribute its personnel and, therefore, it was a reasonable modification to the workplace that did not constitute a necessitous and compelling reason to quit. Despite its contentions, the Board does not dispute the referee's findings, adopted by the Board, that Claimant expressed to Employer that she was resigning due to her dissatisfaction with the emphasis placed on call metrics and that she actually resigned because those metrics caused her stress. (F.F. Nos. 9, 11.) Moreover, this finding is supported by Claimant's testimony, wherein she stated that while the shuffling of the teams was the final straw, she "felt like [they] were just being shuffled around like decks of cards for *better numbers*." (N.T. at 5) (emphasis added). Further, in her brief, Claimant specifically acknowledges that the changing of personnel was not the factor that caused her to terminate her employment; rather "[i]t is and always was the policies, metrics and numbers of [Employer] that is and was the issue." (Claimant's Br. at 13.)

As Claimant has proven a real and substantial pressure to terminate her employment, the question then turns to if Claimant acted with ordinary common sense

and made a reasonable effort to preserve her employment and, in so doing, satisfied the third and fourth requirements of the *Brunswick Hotel* test. "Claimants have the duty to take all necessary and reasonable steps to preserve employment." *Anchor Darling Valve Co. v. Unemployment Compensation Board of Review*, 598 A.2d 647, 649 (Pa. Cmwlth. 1991). When offered a new position or a possible solution to the necessitous and compelling condition, a claimant may not speculate that the proposed change is unsuitable; she must give the arrangement a chance in an attempt to preserve her employment. *Monaco v. Unemployment Compensation Board of Review*, 565 A.2d 127, 131 (Pa. 1989) (denying benefits where two employees speculated that their new pay structure would be unsatisfactory but did not give the new pay structure a chance before terminating their employment). "If the employer promises to take action to alleviate the problem, good faith requires that the employee continue working until or unless the employer's action proves ineffectual." *Craighead-Jenkins v. Unemployment Compensation Board of Review*, 796 A.2d 1031, 1034 (Pa. Cmwlth. 2002). Never attempting an employer's proposed new arrangement to alleviate the necessitous and compelling condition will not support a finding that the employer's modifications were unreasonable. *Unangst v. Unemployment Compensation Board of Review*, 690 A.2d 1305, 1308 (Pa. Cmwlth. 1997) (holding that a claimant did not prove the job modifications were unreasonable and rose to the level that would compel a reasonable person to terminate her employment where she did not attempt the new position offered to her and merely speculated that her workload would be increased).

In the present case, we hold that Claimant did not act with ordinary common sense or make a reasonable effort to preserve her employment. Prior to terminating her employment, Claimant was required to make a reasonable effort to preserve her employment. *Anchor Darling Valve Co.*, 598 A.2d at 649. Following

10

Employer's shuffling of teams, Claimant approached human resources representatives to inform them of her desire to resign. (N.T. at 4-5.) After Claimant informed Employer of her intent to resign, Employer set up a meeting with Claimant to discuss her reasons for resigning. Employer presented Claimant with two alternative work arrangements in an attempt to alleviate some of the stress she felt. The first option was to return to her old team leader, which both parties admitted was not a long term solution, and the second was to transfer to Employer's payroll queue. (N.T. at 4, 6.) Claimant turned down the payroll queue option, despite being told the position would be less stressful, testifying, "I still would have to worry about surveys. I still would have to worry about numbers. I still would have to worry about the same issues that compelled me to leave in the first place." (N.T. at 4.)

Employer offered Claimant two possible solutions but Claimant did not try either. Claimant instead speculated that the new payroll position would not be less stressful even though she had no knowledge of what that position would entail. Similar to the claimants in *Monaco* and *Unangst*, "[C]laimant's crucial mistake was in not giving the new arrangement a chance." *Monaco*, 565 A.2d at 131. By failing to make a good faith effort to attempt the solution Employer offered, which Employer assured her would be less stressful and, instead, speculating on the nature of the modification, Claimant failed to act with ordinary common sense and make a reasonable effort to preserve her employment. The Board, in its decision, concluded Claimant's fears about the stress she would experience in the different position was speculative, "as she did not make a good faith effort to preserve the employment relationship and perform the different position prior to quitting." (Board Decision at 1.) We agree with the Board. For this reason, Claimant failed to prove she had a necessitous and compelling reason to quit and her claim for benefits must be denied.

11

Claimant also challenges the Board's ruling that, by working for Employer for four months, she had accepted the terms of employment and, therefore, could not subsequently argue they constituted a necessitous and compelling reason to terminate her employment. (Claimant's Br. at 8-11.) Once an employee has accepted the terms of employment, it is assumed that the conditions of employment are acceptable. *Speck v. Unemployment Compensation Board of Review*, 680 A.2d 27, 30 (Pa. Cmwlth. 1996). "Therefore, the employee may not later assert that dissatisfaction with those terms constitutes a necessitous and compelling reason, unless there has been a change in the employment conditions or the employee was deceived by the employer or the employee was reasonably unaware of the unsuitable conditions when he accepted the position." *Id.*; *Naylon v. Unemployment Compensation Board of Review*, 477 A.2d 912, 913 (Pa. Cmwlth. 1984). However, the claim of being deceived or being unaware of employment conditions can only go so far; "once an employee has accepted new employment terms, he has admitted to their suitability . . . and therefore any later dissatisfaction with those terms, under well settled law, would not constitute cause of a necessitous and compelling nature." *Romao v. Unemployment Compensation Board of Review*, 443 A.2d 1217, 1218 (Pa. Cmwlth. 1982).

Claimant disagrees with the referee's assertion that "[Claimant] worked for [Employer] for 4 months after accepting the position, and therefore . . . [Claimant] accepted the terms and conditions of employment."[3] (Referee Decision at 2.)

---

[3] In her brief, Claimant raises several new points of fact surrounding the timeline of when she worked for Employer, which she claims prove that she did not accept Employer's terms and conditions. Claimant argues that she had only been performing the job for less than a month due to delays in training and that she had informed her team leader of her issues with the position frequently at their weekly one-on-one meetings. Additionally, Claimant, for the first time, submits documentation from her physician detailing her history with anxiety. However, these facts were not raised before the referee in the hearing and so are not a part of the record of the case. Therefore, this

12

However, when asked by the referee during the hearing why she had not left the position as soon as she had discovered that it was based on metrics, Claimant responded, "I tried to make the decision work . . . . And I was willing to say okay, let's see how that goes." (N.T. at 5.) Despite learning of the emphasis on numbers and metrics when starting the job, Claimant continued to work for Employer for four months.

This Court has previously found that even a two-month period of employment where an employee worked under an employer's conditions before later quitting and citing an issue with those same conditions constituted a "delay [that] may be construed as an acceptance." *Romao*, 443 A.2d at 1218. In *Romao*, the claimant was held to have accepted a new pay schema set by his employer and therefore had agreed to the new terms of his employment when he continued working for his employer for two months following the change. *Id.* Claimant in this instance delayed informing Employer that its conditions were not acceptable to her for close to four months. Specifically, Claimant testified that "*right before they broke everybody up*, [she] had even talked to Jeremy, [her] team leader, about it." (N.T. at 5) (emphasis added). Thus, Claimant worked for Employer for four months, only discussing her issues with the numbers and metrics aspect of the job at the end of her employment.

Four months was a more than sufficient amount of time for Claimant to determine whether or not the conditions of her employment were acceptable. Therefore, we hold that Claimant accepted the new terms and conditions of her position and in so doing cannot claim that they were a necessitous and compelling reason for terminating her employment with Employer. *See, e.g.*, *Romao* 443 A.2d at 1218.

Court cannot consider these facts on appeal and must constrain itself to deciding this matter on the facts contained within the certified record. *Umedman v. Unemployment Compensation Board of Review*, 52 A.3d 558, 564 (Pa. Cmwlth. 2012).

13

## Conclusion

Accordingly, because Claimant has not established a necessitous and compelling reason to terminate her employment in accordance with section 402(b) of the Law, the Board's order denying Claimant UC benefits is affirmed.

_____
PATRICIA A. McCULLOUGH, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Beth Kearley,                                    :
        Petitioner                   :
                                 :   No. 1642 C.D. 2018
        v.                           :
                                 :
Unemployment Compensation                        :
Board of Review,                                 :
        Respondent                   :

## *ORDER*

AND NOW, this 11th day of July, 2019, the order of the Unemployment Compensation Board of Review, dated November 16, 2018, is hereby affirmed.

_____
PATRICIA A. McCULLOUGH, Judge